**Laura K. D'Allaird**
**Thomas P. Smith, Jr.**
**Lindsay S. Moilanen**
**Todd D. Brody**
**Elizabeth K. Canizares**
**Samuel M. Kalar**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0080 (Brody)
brodyt@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                        **Plaintiff,**<br><br>    -against-<br><br>**RICHARD T. KIM,**<br><br>                        **Defendant.** | **COMPLAINT**<br><br>25 Civ. 3796 (    )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant, Richard T. Kim ("Kim"), alleges as follows:

**SUMMARY**

1. In just four days in June 2024, Kim, the founder and Chief Executive Officer ("CEO") of Zero Edge Corporation ("Zero Edge"), misappropriated and then lost approximately $3.7 million of the at least $3.8 million that he raised from investors, using the funds for risky crypto asset trading in a personal account and gambling. Kim ultimately confessed to investors that he misappropriated and lost their funds. But even in his confession, Kim misled the investors as to the full extent of his misconduct.

2. From March through June 2024, Kim raised money in a "seed fundraising round" for Zero Edge, an early-stage company that purported to be developing a blockchain-based online casino.

3. Representing to investors that their funds would be used to develop and launch the Zero Edge platform, Kim secured commitments of approximately $5 million from eight equity investors ("Equity Investors") through a private stock placement.

4. Zero Edge's seed financing round closed on June 20, 2024, and the next day investors began sending funds to a Zero Edge crypto asset wallet ("Zero Edge Wallet"). By the end of the day on June 24, 2024, approximately $3.8 million of the $5 million the Equity Investors committed had been sent to the Zero Edge Wallet.

5. On June 21, 2024, minutes after the first of the Equity Investors placed their funds into the Zero Edge Wallet, Kim began diverting those funds for his personal use.

6. Kim transferred all the investor funds received in the Zero Edge Wallet to his personal crypto asset accounts.

7. By the end of the day on June 24, 2024, Kim had lost nearly all of the investor funds through risky crypto asset futures trading and personal gambling at a Curaçao-based online casino ("Online Casino"). Kim also sent at least $99,383 to his personal bank account through transfers on June 21 and 22, 2024, and sent at least $240,060 to certain unknown crypto asset wallets through transfers on June 22, 23, and 24, 2024.

8. The Zero Edge platform never launched, and the company is now going through liquidation proceedings.

9. On June 30, 2024, Kim emailed certain of the Equity Investors ("June 30 Investor Email"). In the June 30 Investor Email, Kim admitted that, after receiving the investors' funds,

he "felt after some time a sudden and uncontrollable urge to find that 'shortcut to success'." He wrote that, following this "urge," he used the Equity Investors' funds to make a series of risky crypto asset trades resulting in a loss of approximately $3.7 million.

10. In the June 30 Investor Email, Kim also asked the Equity Investors to allow him to remain with the company, stating that he could make the lost investor capital back within three months.

11. Kim omitted from the June 30 Investor Email material facts about his use of investor funds while, at the same time, trying to persuade the Equity Investors to allow him to continue to build Zero Edge. While disclosing that he had losses from risky crypto asset trades, Kim failed to disclose that he had diverted at least $707,396 to his account at the Online Casino and that he had sent at least $339,443 to his personal bank account and to the unknown crypto asset wallets.

12. Kim resigned as Zero Edge's CEO on July 2, 2024. On or about July 6, 2024, Kim fled to Dubai and ultimately to South Korea. Zero Edge was placed in liquidation on December 19, 2024.

## VIOLATIONS

13. By virtue of the foregoing conduct and as alleged further herein, Kim has violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

14. Unless Kim is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

15. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

16. The Commission seeks a final judgment: (a) ordering permanent injunctive relief against Kim; (b) ordering Kim to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Kim to pay civil monetary penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Kim from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently prohibiting Kim from participating in the offer and sale of securities; (f) permanently prohibiting Kim from acting or being associated with any broker or dealer; and (g) ordering any other and further relief the Court may deem just and proper.

**JURISDICTION AND VENUE**

17. This Court has jurisdiction over this action pursuant to Securities Act Section 22 [15 U.S.C. § 77v] and Exchange Act Section 27 [15 U.S.C. § 78aa].

18. In connection with the conduct alleged in this Complaint, Kim, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

19.     Venue is proper in the Southern District of New York pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].  Kim was formerly a resident of and transacted business in the Southern District of New York, and certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including that Kim solicited and made false and misleading statements to investors residing in this District.

### DEFENDANT

20.     **Kim**, age 39, is the founder and former CEO of Zero Edge.  Prior to founding Zero Edge, from 2018 to early 2024 Kim served as a general partner and Chief Operating Officer ("COO") at a crypto asset venture capital firm located in New York, NY ("VC Firm").  From 2012 through 2018, Kim was an executive in the securities industry, serving as the COO of Global Foreign Exchange and Emerging Markets Trading for one Commission-registered broker-deal and co-COO of Global Foreign Exchange and Emerging Markets Trading for a second Commission-registered broker-dealer.  Kim was also a member of the New York State Bar and worked as an attorney in New York from 2007 until 2012.

### OTHER RELEVANT ENTITY

21.     **Zero Edge** was incorporated on April 11, 2024, in the Cayman Islands, and had a principal place of business in Grand Cayman, Cayman Islands.  Zero Edge was founded with a stated purpose of building a blockchain-based online casino.  Plans for Zero Edge also included the possible issuance of crypto assets related to the Zero Edge platform.  Neither the Zero Edge platform or related crypto assets were ever launched.  On December 19, 2024, Zero Edge entered voluntary liquidation in the Cayman Islands.

## FACTS

I. **KIM LAUNCHES ZERO EDGE**

22. Kim began developing Zero Edge while employed by the VC Firm.

23. The VC Firm agreed to incubate the Zero Edge project and provided Kim with administrative and legal support to help launch Zero Edge, in exchange for an equity stake in Zero Edge and a share of any crypto assets Zero Edge issued.

24. On or about March 29, 2024, Kim publicly announced his founding of Zero Edge.

25. In communications with prospective investors and in public statements, Kim described Zero Edge as a decentralized, blockchain-based platform for online casino gaming. Rather than having the platform earn the "house edge" characteristic of traditional casinos, Kim pitched Zero Edge as allowing gamblers to "be the house," as the platform would return revenues and fees to users.

26. For example, in a February 8, 2024, email to an eventual Equity Investor ("Equity Investor 3"), Kim stated that Zero Edge would be "an autonomous casino owned by nobody and everybody, with its own native crypto asset for each game, in which house edge is returned to losing bettors and on-chain revenues from swap fees and membership are distributed to participants."

27. A Zero Edge whitepaper ("Whitepaper") distributed by Kim to potential investors throughout the seed fundraising round explained that holders of crypto assets issued by Zero Edge would govern the Zero Edge platform after launch, and gambling on the platform would be done using game-specific crypto assets that Zero Edge would also create.

28. Because the Zero Edge platform never launched, Zero Edge never created or distributed any crypto assets.

## II. KIM SOLICITS INVESTORS IN ZERO EDGE

29. Kim began soliciting equity investors in Zero Edge beginning in or about February 2024.

30. In a February 17, 2024, email, for example, Kim told Equity Investor 3 that he "would love to explore" an investment in Zero Edge with Equity Investor 3 and that he "just started talking to a limited number of VCs this week (just four of them)."

31. By June 20, 2024, Kim had obtained commitments of approximately $5 million from the eight Equity Investors, each of whom executed a Series Seed Purchase Agreement with Zero Edge that entitled them to equity shares in Zero Edge valued at $11.5028 per share.

32. The Equity Investors also executed Token Letter Agreements with Zero Edge that guaranteed them a percentage of the initial supply of crypto assets that were ultimately going to be issued by Zero Edge. The Token Letter Agreements specifically stated that funds raised would be used for the development of Zero Edge's technology.

33. The following chart shows the amount of funds pledged by the eight Equity Investors and the shares and crypto assets they contracted to receive from Zero Edge:

| Investor Name | Amount Invested | Shares Purchased | Crypto Asset Allocation |
|---|---|---|---|
| Equity Investor 1 | $2,099,997.18 | 182,564 | 4.0385% |
| Equity Investor 2 | $499,992.21 | 43,467 | 0.9615% |
| Equity Investor 3 | $499,992.21 | 43,467 | 0.9615% |
| Equity Investor 4 | $499,992.21 | 43,467 | 0.9615% |
| Equity Investor 5 | $249,990.36 | 21,733 | 0.4808% |
| Equity Investor 6 | $144,992.80 | 12,605 | 0.2788% |
| Equity Investor 7 | $999,995.92 | 86,935 | 1.9231% |
| Equity Investor 8 | $49,991.17 | 4,346 | 0.0961% |
| **Total** | **$5,044,944** | **438,584** | **9.70%** |

## III. KIM MAKES MATERIALLY MISLEADING STATEMENTS TO ZERO EDGE INVESTORS

34. Kim represented to prospective investors, including the Equity Investors, that he

intended to use their invested funds to develop and launch the Zero Edge platform.

35. Among the documents that Kim disseminated to potential investors was the Zero Edge Whitepaper, which explained Zero Edge and the investment. The Whitepaper changed over time, with at least 14 versions as of May 23, 2024. Kim was responsible for and had ultimate authority over each version of the Whitepaper.

36. The Whitepaper described Kim's efforts to build the Zero Edge platform and implied that this was the purpose for which money was being raised.

37. Although the Whitepaper itemized several potential risks of an investment in Zero Edge, it did not include the risk that Kim—or anyone else—would misappropriate investor funds for personal use, including gambling and personal crypto asset trading.

38. Based on Kim's representations, Equity Investor 1 understood that investor funds provided during the seed financing round would be used to develop the Zero Edge technology and launch the Zero Edge platform.

39. A term sheet signed by Kim and Investor 1 on April 13, 2024, specifically provided that certain "important decisions" made by Zero Edge would require the "[c]onsent of the holders of more than 50% of the Series Seed Shares." The matters that required investor majority consent included to make any loan or advance to any person.

40. Equity Investor 1 was unaware, prior to learning of Kim's misappropriation, that investor funds would be placed in Kim's personal accounts.

41. On March 4, 2024, during the negotiation of Equity Investor 3's potential investment in Zero Edge, Kim emailed Equity Investor 3 version 7 of the Whitepaper, a 19-page, single-spaced document detailing: the ethos behind Zero Edge; its "core design pillars"; the qualifications of the "team" behind Zero Edge, including Kim's depth of experience in "law,

markets, crypto and gaming"; and details for "monetization" of games that Zero Edge intended to launch, together with certain crypto assets, beginning in June 2024.

42. Kim also attached to his March 4, 2024, email to Equity Investor 3 a response to due diligence questions posed by Equity Investor 3. In the response to the due diligence questions, Kim explained, among other things, that the purpose of his initial fundraising efforts was "to bridge operating costs prior to VC raise (no institutions)."

43. An Investor Rights Agreement, executed by Kim and Investor 1, Investor 7, and others on June 20, 2024, acknowledged that Zero Edge induced the Equity Investors to "invest funds in the Company [Zero Edge]."

44. Kim knew, or recklessly disregarded, that his statements to potential investors were false or misleading given that Kim's intention was to use investor funds for personal use and not for launching the Zero Edge platform.

45. On July 9, 2024, Equity Investor 1, Equity Investor 7, and others involved with Zero Edge, including a Director of Zero Edge, filed a complaint with the Commission ("July 9 Investor Letter") stating that their investment in Zero Edge was "based on representations by Kim that the Seed Funds would be used to develop the Zero Edge platform, including to pay for legal counsel to ensure that the platform could be built in compliance with applicable laws."

IV. **KIM MISAPPROPRIATES INVESTOR FUNDS SHORTLY AFTER RECEIPT**

46. On June 21, 2024, certain Equity Investors deposited approximately $1.7 million in USDC (a crypto asset designed to maintain price equivalence to the US dollar) into the Zero Edge Wallet, which had been created by Kim to receive investor funds on behalf of Zero Edge.

47. In every instance, Kim initially moved funds from the Zero Edge Wallet, which had been created by Kim to receive investor funds on behalf of Zero Edge, to a personal crypto

asset account ("Personal Crypto Asset Account 1"). Most of the time, he then sent investor funds to a second personal crypto asset account ("Personal Crypto Asset Account 2" and, together with Personal Crypto Asset Account 1, "Personal Crypto Asset Accounts").

48. On June 24, 2024, another Equity Investor deposited approximately $2.1 million in USDC into the Zero Edge Wallet.

49. Kim began to misappropriate the investor funds almost immediately.

50. For example, on June 21, 2024, at 2:55pm UTC, the first Equity Investor deposited approximately $1 million of USDC into the Zero Edge Wallet.

51. In four transactions over the next hour, Kim transferred the entirety of this deposit to Personal Crypto Asset Account 1 and then onward to Personal Crypto Asset Account 2.

52. In the middle of that period, Kim transferred approximately $50,000 from Personal Crypto Asset Account 2 to his account at the Online Casino.

53. Over the next couple of hours, Kim transferred an additional approximately $177,000 of investor money from Personal Crypto Asset Account 2 to his account at the Online Casino.

54. A similar pattern occurred on June 24, 2024. At 12:10 pm UTC, an Equity Investor deposited approximately $2.1 million in USDC into the Zero Edge Wallet.

55. In two transactions over the next 21 minutes, Kim transferred the entirety of those investor funds to Personal Crypto Asset Account 1.

56. At 1:19 pm UTC, Kim transferred approximately $900,000 from Personal Crypto Asset Account 1 to Personal Crypto Asset Account 2. Four minutes later, Kim transferred approximately $53,000 from Personal Crypto Asset Account 2 to his account at the Online Casino.

57. In total, from June 21 to June 24, 2024, Kim transferred at least $707,396 in investor funds from his Personal Crypto Asset Accounts to his account at the Online Casino.

58. During the same period, Kim also transferred at least $99,383 of investor funds to his personal bank account and at least $240,060 to certain unknown crypto asset wallets.

59. Kim transferred at least $2,643,982 of investor funds to his personal crypto asset futures trading account ("Futures Trading Account") where he placed risky crypto asset futures trades. Kim lost most of these investor funds as prices of the crypto assets in which he traded fell.

60. Kim's only use of investor funds for a potentially legitimate Zero Edge business purpose appears to be a $103,635 payment to a payroll services provider.

61. Kim's misappropriation of investor funds from June 21 to June 24, 2024, can be broken down as follows:



62. Thus, Kim misappropriated approximately $3.7 million of the approximately $3.8 million in investor money supposed to have been used to develop the Zero Edge platform.

## V. KIM PARTIALLY CONFESSES HIS MISCONDUCT AND SEEKS TO CONCEAL THE EXTENT OF HIS MISAPPROPRIATION SCHEME

63. After misappropriating the Equity Investors' funds, Kim sent the June 30 Investor Email, claiming that he was "committed to full transparency" and purporting to detail his misappropriation through a "full summary of the events that transpired."

64. Blaming his misuse of investor funds on a "deep-rooted gambler's mentality" that resulted in "shockingly poor decision making," Kim wrote that he sent "$3.792 million" in investor funds to his personal crypto asset accounts, then "[a]s the funds sat there in my . . . account, I felt after some time a sudden and uncontrollable urge to find that 'shortcut to success'."

65. Kim then stated that he "establish[ed] leverage long positions across a basket of crypto" and that he "would gradually increase these positions throughout the coming days, with significantly negative PNL impact in the days to come[.]"

66. This strategy, he admitted, "turned into a desperate attempt to trade my way out of the hole."

67. Kim did not succeed, resulting in "[t]otal trading losses of seed round proceeds" of "$3.67 million."

68. That said, as Kim knew, or recklessly disregarded, the statements he made in the June 30 Investor Email were misleading. His purportedly "full" confession did not mention the investor funds that Kim sent to his account at the Online Casino or his diversion of funds to his personal bank account and to certain unknown crypto asset wallets.

69. Kim also did not explain why his "sudden urge" to gamble with investor funds on June 21, 2024, resulted in his continued misappropriation of the new Equity Investor funds deposited in the Zero Edge Wallet on June 24, 2024, or why he continued to allow Equity

12

Investors to transfer funds to Zero Edge days after his misappropriation began.

70. Kim also attempted in the June 30 Investor Email to persuade the Equity Investors to continue to allow him to develop Zero Edge, writing that he would like to "continue working as creative/product lead to bring our product to market" and "[r]epay the Company the monies I lost over time."

71. Kim also tried to raise additional funds for Zero Edge in the June 30 Investor Email, setting forth a short-term "Roadmap" for Zero Edge that included going "public with Zero Edge," raising more funds through a "'founders' membership' sale," releasing Zero Edge's first game, and issuing new crypto assets.

72. Unable to persuade the Equity Investors to allow him to continue with the company, Kim resigned as Zero Edge's CEO on or about July 2, 2024.

73. On or about July 6, 2024, Kim fled the United States, flying from Puerto Rico to New York, then to Dubai, UAE, and ultimately to Seoul, South Korea.

74. In the July 9 Investor Letter, the Zero Edge Equity Investors expressed their concern "that Kim may pose a continuing danger to other investors, as we understand that he is now trying to raise capital for a new venture, unconnected to [Zero Edge], that would mimic Zero Edge's business plan."

## VI. KIM'S DECEPTION CONTINUES AFTER HIS RESIGNATION AS CEO

75. Following his misleading confession in the June 30 Investor Email, Kim also omitted material information in additional statements he made to investors, the public, and to the Commission in order to minimize the extent and character of his misappropriation of Zero Edge's investor funds.

76. On July 9, 2024, Kim filed a "self report" with the Commission. Among other

things, Kim told the Commission that he engaged in a "grossly negligent misuse of [Zero Edge] funds," and that he "take[s] full responsibility for what he did."

77. Kim also told the Commission that he "had no intent to hide" his use of investor funds, and "provided a full trade log and audit record to investors, and have provided them full transparency throughout the process."

78. The records that Kim provided to the Equity Investors and the Commission did not disclose Kim's diversion of investor funds to his personal Online Casino Account, his personal bank account, and certain unknown crypto asset wallets. Thus, as Kim knew or recklessly disregarded, he did not "provide[] a full trade log and audit record" showing the misuse of funds and did not "provide[] them with full transparency throughout the process."

79. On July 15, 2024, a digital media and information services company for the crypto asset and blockchain technology community published an online article titled "Crypto Casino Founder Apologizes for Gambling Away Investor Funds." Included in the article were statements made by Kim.

80. In the article, Kim is quoted as saying: "I really f—d up. I lost this money. It was grossly negligent. But I didn't intend to go run away with this money." The article also quotes Kim as saying: "[T]he moment I received the proceeds, something snapped. . . . I messed up catastrophically."

81. Also on July 15, 2024, Kim published a blog on Substack.com titled "Re:Genesis." The post included much of the same information quoted in the July 15, 2024, article. In it, Kim stated that he "raised millions from top investors and close friends to build Zero Edge," then "really messed up."

82. In the July 15, 2024, article and blog post, Kim once again did not disclose that he

transferred investor funds to his personal account at the Online Casino, to his personal bank account, and to certain unknown crypto asset wallets, admitting only to losing investor funds in leveraged crypto asset trades.

83. In these statements, Kim tried to regain the trust of his investors. Kim's pleas in his blog post for investors to "stick with [him]" and "be [his] lifetime beneficiaries" are an extension of his fraudulent scheme to lull investors into complacency and to raise more funds.

84. To date, Kim has not repaid the funds he misappropriated.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

85. The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 84.

86. By reason of the conduct described above, Kim, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails: (1) knowingly or recklessly employed one or more devices, schemes or artifices to defraud; (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

87. By reason of the foregoing, Kim, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

88. The Commission re-alleges and incorporates by reference here the allegations in Paragraphs 1 through 84.

89. By reason of the conduct described above, Kim, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to defraud; (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

90. By reason of the foregoing, Kim, directly or indirectly, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Kim and his agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Kim to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Kim to pay civil monetary penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**IV.**

Permanently prohibiting Kim from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

**V.**

Permanently prohibiting Kim from participating, directly or indirectly—including, but not limited to, through any entity owned or controlled by him—in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal accounts;

**VI.**

Permanently prohibiting Kim from, directly or indirectly, acting or being associated with any broker or dealer, provided, however, that such injunction shall not prevent Kim from being a client of a broker or dealer. For purposes of this injunction, a person is associated with a broker or dealer if such person is a partner, officer, or director of such broker or dealer (or performs

similar functions), or directly or indirectly controls or is controlled by such broker or dealer, including any employee of such broker or dealer; and

## VII.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
May 7, 2025

                                        /s/ Todd D. Brody
Todd D. Brody
Laura K. D'Allaird
Thomas P. Smith, Jr.
Lindsay S. Moilanen
Elizabeth K. Canizares
Samuel M. Kalar
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
(212) 336-0080 (Brody)
brodyt@sec.gov